KM

**WO**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| DaJuan Williams, | No.    CV 22-01163-PHX-MTL (CDB) |
| Plaintiff, | |
| v. | **ORDER** |
| Yuma County, et al., | |
| Defendants. | |

On July 11, 2022, Plaintiff DaJuan Williams, who is confined in the Arizona State Prison Complex (ASPC)-Lewis, filed a pro se civil rights Complaint pursuant to 42 U.S.C. § 1983 (Doc. 1).  On August 4, 2022, he filed a Motion for Excusable Neglect in Any Untimeliness (Doc. 4) and, on August 5, 2022, he filed a duplicate Complaint.[1]  On August 11, 2022, Plaintiff filed an Application to Proceed In Forma Pauperis (Doc. 6).  The Court will deny as moot the Motion; order Defendants Alvarez, Russom, Rendon, Cooper, Guerrero, Arriola, Ruelle, Sanchez, Lopez, Aguayo, Perez, Navarro, Zepeda, Rendon, and Hand to answer Counts One through Four of the Complaint; and dismiss the remaining claims and Defendants without prejudice.

## I.    Application to Proceed In Forma Pauperis and Filing Fee

The Court will grant Plaintiff's Application to Proceed In Forma Pauperis.  28 U.S.C. § 1915(a).  Plaintiff must pay the statutory filing fee of $350.00.  28 U.S.C.

---

[1] Because this Complaint is identical to the original Complaint, the Court will not treat it as an amended complaint.

§ 1915(b)(1).  The Court will assess an initial partial filing fee of $7.14.  The remainder of the fee will be collected monthly in payments of 20% of the previous month's income credited to Plaintiff's trust account each time the amount in the account exceeds $10.00. 28 U.S.C. § 1915(b)(2).  The Court will enter a separate Order requiring the appropriate government agency to collect and forward the fees according to the statutory formula.

**II.      Statutory Screening of Prisoner Complaints**

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or an employee of a governmental entity.  28 U.S.C. § 1915A(a).  The Court must dismiss a complaint or portion thereof if a plaintiff has raised claims that are legally frivolous or malicious, that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief.  28 U.S.C. § 1915A(b)(1)–(2).

A pleading must contain a "short and plain statement of the claim *showing* that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2) (emphasis added).  While Rule 8 does not demand detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Thus, although a plaintiff's specific factual allegations may be consistent with a constitutional claim, a court must assess whether there are other "more likely explanations" for a defendant's conduct.  *Id.* at 681.

. . . .

But as the United States Court of Appeals for the Ninth Circuit has instructed, courts must "continue to construe *pro se* filings liberally." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). A "complaint [filed by a *pro se* prisoner] 'must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Id.* (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)).

**III.    Complaint**

Plaintiff names the following Defendants in his six-count Complaint: Yuma County; Yuma County Sheriff Leon N. Wilmot; Sergeants Robert Arriola, Ramon Rendon, T. Ruelle, Sanchez, A. Serna, C. Silva, and Eldee Harper, Jr.; Lieutenants Michael Cooper, Duarte, Gomez, Guerrero, and Oberosler; Captain Kelly D. Milner; Senior Detention Officers Julian Aguayo, D. Perez, Rodriguez, Russom, and William Valdez; Detention Officers (DO) Alvarez, Caudillo, Covarrubias, Victor Davalos, C. Hand, L. Lopez, Eric Mendez, I. Navarro, Diana Sosa, and A. Zepeda; and Does 1-50. Plaintiff seeks money damages.

**IV.    Discussion**

**A.    Count One**

In Count One, Plaintiff alleges Defendants used excessive force on him, in violation of the Fourteenth Amendment. Plaintiff alleges that on May 5, 2022, he was transferred from the Arizona Department of Corrections, Rehabilitation and Reentry (ADC) to Yuma County Detention Center (YCDC) for a hearing in Yuma County Superior Court. Upon arriving at the Jail, Plaintiff "was non-compliant with certain DO directives"; he refused to be fingerprinted or photographed or submit to a strip search or any "body scan procedures." (Doc. 1 at 6.) However, Plaintiff asserts he was not assaultive or combative. Plaintiff states that although there "was an incident where [he] was alleged to have been in possession of contraband," the item was removed by a detention officer without incident. (*Id.*) Defendants Arriola, Rendon, Ruelle, Lopez and other unknown officers escorted Plaintiff to the "F1-SMU1 unit," placed him in a cell, and, as punishment, removed the mattress from the cell and prohibited Plaintiff from having linens, bedding, or

hygiene items. Defendant Arriola also ordered that Plaintiff be placed in "SMU handcuffs," which are handcuffs that are connected with a solid piece of metal, instead of chain links, preventing the wearer from moving his hands "outside of the horizontal position" and immobilizing the hands with palms facing in and thumbs up. (*Id.*) The detention officers then left Plaintiff in the cell, restrained in the SMU handcuffs and leg shackles, for approximately 20 hours, "without any relief." (*Id.* at 7.)

After being in the cell for about one hour, Plaintiff notified Defendant Alvarez that he needed to defecate, and Defendant Alvarez responded, "oh well." (*Id.*) Plaintiff then explained he did not have toilet paper and could not use the restroom while restrained; Alvarez stated, "well you shouldn't have been acting how you were acting." (*Id.*) Plaintiff states Alvarez eventually brought him "2 to 3 feet of toilet paper and told [him] that per Sgt. Sanchez, the restraints will not be removed." (*Id.*) Plaintiff stated he could not defecate while restrained and, even if he could, he did not have enough toilet paper. Defendant Alvarez told him to figure it out.

After the shift change, Plaintiff notified Defendant Russom that he had never been fed lunch and had been needing to defecate for several hours. Defendant Russom told him, "you should have thought about that before you decided to misbehave," and walked away. (*Id.*) Plaintiff later requested to speak to Russom with the conversation recorded, that he be allowed to defecate, and that he be given bedding. Plaintiff claims his requests were denied and he was forced to "hold it in until [he] was returned to the prison over 20 hours later." (*Id.*)

Plaintiff spent the night in shackles and handcuffs "in a freezing cold cell where [he] was forced to sit and lay on [and] ice cold concrete slab without any protections or reliefs." (*Id.*) He was deprived of sleep and had stomach pains from "holding in [his] waste"; was in pain from the restraints; lost feeling in his hands, arms, and legs; and, over time, the restraints began to cut into his body. (*Id.*) Plaintiff claims his ankles "ended up being severely cut up and caused [him] significant and excruciating pain where the

restraints continued to rub against and cut into [his] wounds throughout the night and through the following day." (*Id.*)

The next day, before being taken to court, Plaintiff demanded medical care for his wounds. Plaintiff claims medical staff cleaned the wounds and applied ointment and Band-Aids, but the handcuffs were never removed. Plaintiff explained to a nurse about the pain he was in, and she asked the detention officers if they would allow Plaintiff to use the bathroom. Defendant Rendon denied the request. Plaintiff claims the restraints continued to rub through the Band-Aids, causing him significant pain and causing his wounds to bleed again.

After the court proceedings, Defendants Cooper and Guerrero, under Defendant Arriola's instructions, placed Plaintiff in "some sort of contraption or device that rendered [his] body immobile and restrained [him] to an upright sitting position." (*Id.* at 8.) Plaintiff was instructed to lay on his stomach on the floor on a reinforced blanket, which was then tightly wrapped around his legs and fastened with straps, preventing all movement of his legs. Plaintiff was then rolled over, placed in a sitting position, and placed in a vest that had a series of straps, loops, and buckles "connecting the 'straitjacket' life vest to the contraption on his legs." (*Id.*) Plaintiff was secured in an upright, immobile position with his hands still cuffed behind his back and shackles still secured around his ankles. Plaintiff contends that because he had "not assaulted anyone and was not combative and was compliant with all orders, and since [he had] never in [his] life engaged in, and was not at that time engaging in, any type of self harm," he understood his restraints to be "punishment intended to torture and humiliate [his] person." (*Id.*)

Defendant Ruelle and another officer took documentary photos of Plaintiff and then carried him out to a vehicle and strapped him into the back seat. Plaintiff alleges Defendant Cooper tried to have a spit mask placed over Plaintiff's face and head, even though Plaintiff was not, and had never, "engag[ed] in any such conduct." (*Id.*) Plaintiff asserts Defendant Guerrero was "taking pictures and recording video with his personal cell phone while laughing [at Plaintiff] and joking about [Plaintiff's] condition with other [officers]." (*Id.*)

Plaintiff was transported from Yuma to ADC, an approximately 3½ hour drive, in the restraints. Plaintiff suffered severe pain in his arms and shoulders, and his legs and feet "fell asleep" due to lack of movement. (*Id.* at 9.) Plaintiff alleges he was in the restraints for a total of four to five hours.

Plaintiff alleges that after arriving at the prison, Defendant Guerrero "invited the prison's captain and [sergeants] to come out and view the conditions they had placed [Plaintiff] in" and "stood around laughing and joking." (*Id.*) When the restraints were removed, Plaintiff could not walk or stand until he regained circulation in his legs and feet. (*Id.*)

Plaintiff contends he was secured in handcuffs and leg irons for the approximately 28 hours he was in Yuma County Sheriff's Office's custody. During 18 of those hours, he was locked inside of a cell in full restraints and unattended, was never "seen or evaluated by any medical staff," and his restraints were not "checked or [his] condition evaluated by medical or jail staff." (*Id.*) Similarly, after he was placed in the restraint "contraption," he was not seen or evaluated by any medical staff. (*Id.*)

Plaintiff contends Defendants Cooper, Guerrero, Arriola, Rendon, Ruelle, Sanchez, Alvarez, Lopez, Russom, and Does 1-50 violated his Eighth and Fourteenth Amendment rights "as a pretrial detainee[2] to be free of excessive unreasonable, and unnecessary use of force, punishment, torture, and unconstitutional conditions of confinement," when they caused Plaintiff's injuries, or failed to intervene to prevent injury, with "sadistic and malicious intend to punish, harm, or injure." (*Id.*)

. . . .

---

[2] Although Plaintiff was confined in the YCDC in relation to new criminal charges, Plaintiff was not a pretrial detainee at this time. Plaintiff was convicted in 1999 of first-degree murder and first-degree burglary and is serving a term of life imprisonment with a possibility of parole after twenty-five years. *State v. Williams*, 1 CA-CR 99-0759 (Ariz. Ct. App. Aug. 10, 2000). After his criminal proceedings were concluded in Yuma County Superior Court, Plaintiff was returned to the ADC. Accordingly, at the time of the incidents described in the Complaint, Plaintiff was a *convicted prisoner* for purposes of § 1983 litigation. Thus, the Eighth Amendment, not the Fourteenth Amendment, provides the relevant legal standards for analysis of his claims. *See Bell v. Wolfish*, 441 U.S. 520, 524, 545 (1979) (distinguishing pretrial detainees from convicted prisoners temporarily housed in a county jail facility).

Although Plaintiff describes his claims in Count One as excessive force claims, the Court finds his allegations are better categorized as conditions of confinement claims. Liberally construed, Plaintiff has adequately stated Eighth Amendment conditions of confinement claims in Count One against Defendants Alvarez, Russom, Rendon, Cooper, Guerrero, Arriola, Ruelle, Sanchez and Lopez, and the Court will require these Defendants to answer Count One.

**B.    Count Two**

In Count Two, Plaintiff alleges violations of his Fourteenth Amendment rights to be free from excessive force.[3]  Plaintiff claims that on April 12, 2021, "following an incident where officers were refusing to transport him for a scheduled court appearance, he "refused to surrender," through the cell door, the handcuffs he had been restrained in.  Plaintiff states Defendant Rendon and others "repeatedly asked [him] to surrender the cuffs over a period of hours but [he] continued to refuse to do so" and, eventually, the officers entered his cell and used "force against [his] person," although Plaintiff was "never informed of the consequences and given the opportunity to comply based upon notice and informed knowledge." (*Id.* at 10.)

Plaintiff claims that prior to the use of force, Defendant Ruelle and the jail's contract "psych doctor," came to his cell to speak with him and resolve the issue and then left. Plaintiff then, "having [taken] the time to reflect, . . . made the determination to surrender the handcuffs and to comply with officers, however [he] was never give the opportunity." (*Id.*)   Plaintiff claims Defendants Aguayo, Lopez, Perez, Navarro, and Zepeda entered his cell and began "assaulting" him "under the directions" of Defendants Rendon and Hand.  (*Id.*)  Plaintiff claims Defendant Hand twice tried to taser him, but the taser malfunctioned.  Plaintiff alleges he was "slammed against the walls, the toilet/sink, and bunk area and [he] was repeatedly punched in the head, face, and body with closed

---

[3] Because Plaintiff was a convicted prisoner at the time of these events, his excessive force claims are analyzed under the Eighth Amendment, not the Fourteenth Amendment, and the relevant inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).

fists." (*Id.*) Plaintiff asserts he "had [the] handcuffs on his wrist pulled and/or tightened and had cuffs and leg iron shackles tightly applied to [his] wrist and legs." (*Id.*) Plaintiff claims his hair was "yanked and pulled out" and he "had a taser repeatedly pointed at [him] and was threatened with electrocution shocks." (*Id.*) Plaintiff contends this use of force was "unreasonable and completely unnecessary when [he] wasn't given a reasonable opportunity to comply before the use of force and when [he] was willing to surrender and comply." (*Id.* at 10-11.) Plaintiff asserts Defendants Aguayo, Hand, Lopez, Navarro, Perez, Rendon, and Zepeda violated his Eighth and Fourteenth Amendment rights to be free of "excessive, unreasonable, and unnecessary uses of force" when, "with sadistic and malicious intent" to punish, injure, and humiliate Plaintiff, they "committed any one or all of the acts," causing Plaintiff injury. (*Id.* at 11.)

Liberally construed, Plaintiff has adequately stated an Eighth Amendment excessive force claim in Count Two and the Court will require Defendants Aguayo, Lopez, Perez, Navarro, Zepeda, Rendon, and Hand to answer this claim.

### C.   Count Three

In Count Three, Plaintiff alleges Defendant Perez violated his Eighth and Fourteenth Amendment rights when he used excessive force on Plaintiff. Plaintiff claims that on April 12, 2021, as part of the incident in Count Two, Defendant Perez repeatedly punched Plaintiff in the face and head with "closed fisted 'upper cuts' and strikes 5 to 8 times, while [Plaintiff] was in handcuff restraints and being held in place by other officers, and not capable of resisting or defending [himself]." (*Id.* at 12.) Plaintiff asserts Perez also repeatedly "pulled and yanked" Plaintiff's hair, pulling out a chunk of hair and causing a "bloody gash on the top of [Plaintiff's] head," after Plaintiff had been subdued and was lying on his stomach, handcuffed behind his back. (*Id.*) Plaintiff claims "a 300 pound officer" was lying on his back and he could not move or resist in any manner, and "was not saying anything." (*Id.*) Plaintiff also claims that during a prior incident, he explained to Perez that he "would not allow him to touch [Plaintiff's] hair, that for cultural and religious reasons . . . people who are not [his] family members are not allowed to touch [his]

hair." (*Id.*)  Plaintiff claims the incident caused him physical and mental injuries, his head was cut open, and he suffered stress, anger, anxiety, and "feelings of hatred and violent intents at the willful disregard and disrespect to [his] family, culture, and religion." (*Id.*)

Liberally construed, this allegation adequately states an Eighth Amendment excessive force claim and the Court will require Defendant Perez to answer this claim.

### D.   Count Four

In Count Four, Plaintiff alleges his Fourteenth Amendment rights were violated when, on November 8, 2021, following "a staff assault incident," officers under the command of Defendant Arriola used excessive force on Plaintiff.  (*Id.* at 13.)  Plaintiff claims that after the "staff assault incident," he refused to surrender belly chain and handcuff restraints and was "initially resistant and combative with officers." (*Id.*)  Plaintiff alleges that while officers were holding him against the toilet/sink area, Defendant Arriola placed on taser on his left shoulder and "began emptying electrical currents through [Plaintiff's] body which immediately caused [him] to become incapacitated."  (*Id.*)  Plaintiff asserts that even though his body "froze up" and "resistance ceased," Defendant Arriola kept the taser pressed against Plaintiff's shoulder and "continued deploying voltages to [Plaintiff's] body . . . and throughout [Plaintiff's] slow descent to the ground." (*Id.*)  Plaintiff asserts that after he was on the ground and clearly not resisting, Defendant Arriola placed the taser on Plaintiff's stomach and began "deploying electric currents through [Plaintiff's] body again for another 3 to 5 seconds." (*Id.*)

Liberally construed, these allegations adequately state an Eighth Amendment excessive force claim against Defendant Arriola and the Court will require Defendant Arriola to answer Count Four.

### E.   Count Five

In Count Five, Plaintiff alleges his Fourteenth Amendment rights were violated during disciplinary proceedings.  Plaintiff contends Defendant Yuma County has "a custom, policy or practice of punishing pretrial detainees and/or housing inmates under cruel and unusual conditions of confinement . . . without due process." (*Id*. at 15.)  Plaintiff

claims disciplinary violations may result in inmates being indefinitely placed in segregation units, or in the F1-SMU1 punishment unit, or maintained on "zero items" status, "while at the same time, YCDC does not employ nor designate any specific area or unit as 'disciplinary segregation/detention/ housing.'" (*Id.*) Plaintiff alleges that while at the YCDC, he received 19 disciplinary violations, but never received "a single fair and impartial 'hearing' for any one of the violations" and was "subjected to placement and/or continual placement in the Jail[']s F1-SMU1 punishment unit, forced injections with psychotropic drugs, 'zero items status,' and denied access to courts and/or subjected to other punishments." (*Id.*) Plaintiff lists seven disciplinary reports for which he was denied a "reasonable or meaningful opportunity to request a disciplinary hearing or an appeal hearing and/or where [he] was given insufficient or inadequate notice or was deprived of a meaningful opportunity to prepare or present [his] defense, or deprived of a fair or impartial process." (*Id.* at 15-16.)

Plaintiff alleges Defendants Yuma County, Wilmot, Milner, Cooper, Duarte, Gomez, Guerrero, and Oberosler violated his Fourteenth Amendment rights when they "failed to train or hire" or condoned the practice of depriving "YCDC pretrial detainees adequate and meaningful notice of disciplinary charges," disciplinary hearings, or fair and impartial disciplinary hearings; punishing inmates for requesting hearings; and imposing "an atypical and significant hardship on [Plaintiff] while housed in YCDC." (*Id.* at 16.) Plaintiff further alleges Defendants Covarrubias, Davalos, Harper, Mendez, Perez, Rodriguez, Ruelle, Sanchez, Serna, Silva, Sosa, Valdez, and Does 1-50 violated his Fourteenth Amendment rights when they "committed any one or all of the acts—causing any one or all of the injuries as stated herein." (*Id.* at 17.)

In analyzing a due process claim, the Court must first decide whether Plaintiff was entitled to any process, and if so, whether he was denied any constitutionally required procedural safeguard. Liberty interests that entitle an inmate to due process are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force,

1  nonetheless imposes atypical and significant hardship on the inmate in relation to the
2  ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (internal
3  citations omitted).

4        To determine whether an inmate is entitled to the procedural protections afforded
5  by the Due Process Clause, the Court must look to the particular restrictions imposed and
6  ask whether they "'present the type of atypical, significant deprivation in which a state
7  might conceivably create a liberty interest.'"  *Mujahid v. Meyer*, 59 F.3d 931, 932 (9th Cir.
8  1995) (quoting *Sandin*, 515 U.S. at 486).  "Atypicality" requires not merely an empirical
9  comparison, but turns on the importance of the right taken away from the prisoner.  *See*
10  *Carlo v. City of Chino*, 105 F.3d 493, 499 (9th Cir. 1997).  To determine whether the
11  sanctions are atypical and a significant hardship, courts look to prisoner's conditions of
12  confinement, the duration of the sanction, and whether the sanction will affect the duration
13  of the prisoner's sentence.  *See Keenan v. Hall*, 83 F.3d 1083, 1088-89 (9th Cir. 1996).

14        Further, although pro se pleadings are liberally construed, *Haines v. Kerner*, 404
15  U.S. 519, 520-21 (1972), conclusory and vague allegations will not support a cause of
16  action.  *Ivey v. Bd. of Regents*, 673 F.2d 266, 268 (9th Cir. 1982).  A liberal interpretation
17  of a civil rights complaint may not supply essential elements of the claim that were not
18  initially pled.  *Id*.

19        Plaintiff fails to state a claim in Count Five because he does not describe the
20  sanctions he received for each disciplinary conviction at issue and it is therefore impossible
21  to determine whether, for each disciplinary charge, those sanctions were atypical or
22  significant.  *See Sandin*, 515 U.S. at 475-76, 487 (30 days' disciplinary segregation is not
23  atypical and significant); *Smith v. Mensinger*, 293 F.3d 641, 654 (3rd Cir. 2002) (seven
24  months of disciplinary confinement "does not, on its own, violate a protected liberty
25  interest"); *Jones v. Baker*, 155 F.3d 810 (6th Cir. 1998) (two and one-half years'
26  administrative segregation is not atypical and significant); *Rizzo v. Dawson*, 778 F.2d 527,
27  530 (9th Cir. 1985) (prison authorities may change a prisoner's "place of confinement even
28  though the degree of confinement may be different and prison life may be more

1    disagreeable in one institution than in another" without violating a prisoner's due process

2    rights); *Lucero v. Russell*, 741 F.2d 1129 (9th  Cir. 1984) (administrative transfer to

3    maximum security without a hearing does not infringe on any protected liberty interest).

4          Moreover, Plaintiff's allegations regarding what process he did or did not receive

5    are vague.  Plaintiff alleges he was denied adequate time to prepare for some disciplinary

6    hearings, but does state how much time he received.  He alleges the hearings were not

7    impartial, but does explain why they were not, nor does he describe how he was punished

8    for requesting disciplinary hearings.  Plaintiff's allegations in Count Five are too vague to

9    state a claim, and Court will dismiss Count Five.

10         **F.    Count Six**

11         In Count Six, Plaintiff alleges he was retaliated against, in violation of the First

12   Amendment.  Plaintiff claims that when he arrived at the jail in February 2020, he was

13   placed in the F1-SMU1 Unit and, because prisoners in that unit are prohibited from having

14   commissary items, he was not permitted hair ties for his long hair.  Plaintiff began using

15   elastics from face masks as hair ties.  Plaintiff alleges that in December 2020, he had a

16   court hearing regarding writing instruments, during which the court ordered that he be

17   given pens. Plaintiff claims that immediately following the hearing, during the strip search,

18   Defendants Caudillo and Aguayo "huddled up and had a whispered conversation," after

19   which Defendant Aguayo ordered Plaintiff to give him his hair ties.  (*Id*. at 18.)  Because

20   this had not happened in the six months Plaintiff had been wearing hair ties, including to

21   court hearings, he asked why, and Aguayo stated that they were not allowed.  Plaintiff

22   claims that because Defendants Caudillo and Aguayo had escorted Plaintiff for every court

23   hearing, Defendant Aguayo had conducted strip searches of Plaintiff following the

24   hearings, and neither officer had ever made an issue of Plaintiff's hair ties, Plaintiff

25   "understood that this was [his] punishment in retaliation for moving before the courts,

26   asserting [his] constitutional rights, and being granted relief over the objections of SDO

27   Caudillo and the YCDC."  (*Id.* at 19.)  Plaintiff explained to Defendants that they were

28   violating his rights and "he would not be cowed," and did not give them his hair ties.  (*Id.*)

Defendant Aguayo wrote Plaintiff a disciplinary violation for disobeying a direct order, and Defendant Caudillo signed off.  Plaintiff claims he never "received any disciplinary, then or ever, for possessing any contraband or unauthorized items for [his] hair ties."  (*Id.*) Plaintiff claims he filed a grievance on Defendants "even though [he] continued to wear those same hair ties around the Jail and to every single court appearance following the incident."  (*Id.*)  Plaintiff claims both officers were present for his later court hearings and never "made any issue or wrote any disciplinary concerning [Plaintiff's] hair ties."  (*Id.*)

A viable claim of First Amendment retaliation contains five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights (or that the inmate suffered more than minimal harm) and (5) did not reasonably advance a legitimate correctional goal.  *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005); *see also Hines v. Gomez*, 108 F.3d 265, 267 (9th Cir. 1997) (retaliation claim requires an inmate to show (1) that the prison official acted in retaliation for the exercise of a constitutionally protected right, and (2) that the action "advanced no legitimate penological interest").   The plaintiff has the burden of demonstrating that his exercise of his First Amendment rights was a substantial or motivating factor behind the defendants' conduct.  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989).

Plaintiff states he was issued a disciplinary ticket for refusing to comply with a direct order to surrender his hair tie, but he does not state whether he was convicted of the disciplinary ticket or whether he suffered any other consequences as a result of this incident.  Plaintiff has therefore not shown he suffered more than minimal harm or that his exercise of his First Amendment rights was chilled.  Accordingly, Plaintiff fails to state a retaliation claim in Count Six and the Court will dismiss this claim.

. . . .

. . . .

### G.      Defendants Does 1-50

Plaintiff's allegations against the Doe Defendants are vague and conclusory. Plaintiff does not describe who the Doe Defendants are or describe with any factual specificity what any particular Doe Defendant did or failed to do.  This is insufficient.  *See Marcilis v. Twp. of Redford*, 693 F.3d 589, 596 (6th Cir. 2012) (upholding dismissal of *Bivens* complaint that referred to all defendants "generally and categorically" because the plaintiff had failed to "'allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right.'" (quoting *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008))); *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) ("Given the complaint's use of either the collective term 'Defendants' or a list of the defendants named individually but with no distinction as to what acts are attributable to whom, it is impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed.").  The Court will therefore dismiss without prejudice Defendants Does 1-50.

### V.      Motions

On August 4, 2022, Plaintiff filed a Motion for Excusable Neglect in which he states that on July 19, 2022, he was transferred from ASPC-Eyman to ASPC-Lewis and did not have access to his legal property.  Plaintiff asks that the Court excuse any untimeliness in filing his notice of change of address.  The Court received Plaintiffs' Notice of Change of Address before any filing deadlines were set in this case.  The Court will therefore deny the motion as moot.

On August 26, 2022, Plaintiff filed a Motion for Document Number Sheet (Doc. 8). The Court will grant the Motion and direct the Clerk of Court to send Plaintiff a copy of the docket for this case.

### VI.      Warnings

### A.      Release

If Plaintiff is released while this case remains pending, and the filing fee has not been paid in full, Plaintiff must, within 30 days of his release, either (1) notify the Court

that he intends to pay the unpaid balance of his filing fee within 120 days of his release or (2) file a <u>non</u>-prisoner application to proceed in forma pauperis.  Failure to comply may result in dismissal of this action.

**B.    Address Changes**

Plaintiff must file and serve a notice of a change of address in accordance with Rule 83.3(d) of the Local Rules of Civil Procedure.  Plaintiff must not include a motion for other relief with a notice of change of address.  Failure to comply may result in dismissal of this action.

**C.    Copies**

Because Plaintiff is currently confined in an Arizona Department of Corrections unit subject to General Order 14-17, Plaintiff is not required to serve Defendants with a copy of every document he files or to submit an additional copy of every filing for use by the Court, as would ordinarily be required by Federal Rule of Civil Procedure 5 and Local Rule of Civil Procedure 5.4.  Plaintiff may comply with Federal Rule of Civil Procedure 5(d) by including, with every document he files, a certificate of service stating that this case is subject to General Order 14-17 and indicating the date the document was delivered to prison officials for filing with the Court.

**If** Plaintiff is transferred to a unit other than one subject to General Order 14-17, he will be required to: (a) serve Defendants, or counsel if an appearance has been entered, a copy of every document that he files, and include a certificate stating that a copy of the filing was served; and (b) submit an additional copy of every filing for use by the Court. *See* Fed. R. Civ. P. 5(a) and (d); LRCiv 5.4.  Failure to comply may result in the filing being stricken without further notice to Plaintiff.

**D.    Possible Dismissal**

If Plaintiff fails to timely comply with every provision of this Order, including these warnings, the Court may dismiss this action without further notice. *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1260-61 (9th Cir. 1992) (a district court may dismiss an action for failure to comply with any order of the Court).

**TERMPSREF**

- 15 -

**IT IS ORDERED:**

(1)     Plaintiff's Application to Proceed In Forma Pauperis (Doc. 6) is **granted**.

(2)     As required by the accompanying Order to the appropriate government agency, Plaintiff must pay the $350.00 filing fee and is assessed an initial partial filing fee of $7.14.

(3)     Plaintiff's Motion for Excusable Neglect (Doc. 4) is **denied** as moot.

(4)     Plaintiff's Motion for a Document Number Sheet (Doc. 8) is **granted**; the Clerk of Court **must send** Plaintiff a copy of the docket for this case.

(5)     Counts Five and Six are **dismissed** without prejudice.

(6)     Defendants Yuma County, Wilmot, Duarte, Gomez, Oberosler, Milner, Caudillo, Covarrubias, Davalos, Harper, Mendez, Rodriguez, Serna, Silva, Sosa, Valdez, and Does 1-50 are **dismissed** without prejudice.

(7)     Defendants Alvarez, Russom, Rendon, Cooper, Guerrero, Arriola, Ruelle, Sanchez, Lopez, Aguayo, Perez, Navarro, Zepeda, Rendon, and Hand must answer Counts One through Four, as described above.

(8)     The Clerk of Court must send Plaintiff this Order, and a copy of the Marshal's Process Receipt & Return form (USM-285) and Notice of Lawsuit & Request for Waiver of Service of Summons form for Defendants Alvarez, Russom, Rendon, Cooper, Guerrero, Arriola, Ruelle, Sanchez, Lopez, Aguayo, Perez, Navarro, Zepeda, Rendon, and Hand.

(9)     Plaintiff must complete and return the service packet to the Clerk of Court within 21 days of the date of filing of this Order.  The United States Marshal will not provide service of process if Plaintiff fails to comply with this Order.

(10)    If Plaintiff does not either obtain a waiver of service of the summons or complete service of the Summons and Complaint on a Defendant within 90 days of the filing of the Complaint or within 60 days of the filing of this Order, whichever is later, the action may be dismissed as to each Defendant not served.  Fed. R. Civ. P. 4(m); LRCiv 16.2(b)(2)(B)(ii).

(11)    The United States Marshal must retain the Summons, a copy of the Complaint, and a copy of this Order for future use.

(12)    The United States Marshal must notify Defendants of the commencement of this action and request waiver of service of the summons pursuant to Rule 4(d) of the Federal Rules of Civil Procedure.  The notice to Defendants must include a copy of this Order.

(13)    A Defendant who agrees to waive service of the Summons and Complaint must return the signed waiver forms to the United States Marshal, not the Plaintiff, **within 30 days of the date of the notice and request for waiver of service** pursuant to Federal Rule of Civil Procedure 4(d)(1)(F) to avoid being charged the cost of personal service.

(14)    The Marshal must immediately file signed waivers of service of the summons.  If a waiver of service of summons is returned as undeliverable or is not returned by a Defendant within 30 days from the date the request for waiver was sent by the Marshal, the Marshal must:

(a)    personally serve copies of the Summons, Complaint, and this Order upon Defendant pursuant to Rule 4(e)(2) of the Federal Rules of Civil Procedure; and

(b)    within 10 days after personal service is effected, file the return of service for Defendant, along with evidence of the attempt to secure a waiver of service of the summons and of the costs subsequently incurred in effecting service upon Defendant.  The costs of service must be enumerated on the return of service form (USM-285) and must include the costs incurred by the Marshal for photocopying additional copies of the Summons, Complaint, or this Order and for preparing new process receipt and return forms (USM-285), if required.  Costs of service will be taxed against the personally served Defendant pursuant to Rule 4(d)(2) of the Federal Rules of Civil Procedure, unless otherwise ordered by the Court.

. . . .

(15)   Defendants must answer the Complaint or otherwise respond by appropriate motion within the time provided by the applicable provisions of Rule 12(a) of the Federal Rules of Civil Procedure.

(16)   Any answer or response must state the specific Defendant by name on whose behalf it is filed.  The Court may strike any answer, response, or other motion or paper that does not identify the specific Defendant by name on whose behalf it is filed.

(17)   This matter is referred to Magistrate Judge Camille D. Bibles pursuant to Rules 72.1 and 72.2 of the Local Rules of Civil Procedure for all pretrial proceedings as authorized under 28 U.S.C. § 636(b)(1).

Dated this 26th day of September, 2022.


Michael T. Liburdi
United States District Judge